**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

————————————————————— :
:
RICHARD B. MONTICCIOLO,       :
:
                     Plaintiff,    :      Civil Action No. 15-8134 (FLW) (DEA)
:
        v.                  :
:               **OPINION**
TROOPER GLENN T. ROBERTSON;  :
ALEXANDER DANESE; KYE JUN;    :
and LT. MICHAEL PLASKON, et al.,  :
:
                Defendants.   :
————————————————————— :

**WOLFSON, United States District Judge:**

Plaintiff Richard Monticciolo ("Plaintiff") filed the instant civil rights action, pursuant to 42 U.S.C. § 1983, against defendants State Trooper Glenn Robertson ("Trooper Robertson"), East Brunswick Police Officers Alexander Danese and Kye Jun, and East Brunswick Lieutenant Michael Plaskon (collectively, "Defendants"), alleging that Trooper Robertson's use of a police dog to effectuate Plaintiff's arrest, following a motor vehicle stop, constituted excessive force in violation of the Fourth Amendment. Plaintiff also asserts a § 1983 claim against Danese, Jun, and Lt. Plaskon (collectively, the "East Brunswick Defendants") for failing to intervene prior to the police dog bite.[1]

Presently before the Court is Trooper Robertson's Motion for Summary Judgment on Plaintiff's excessive force claim, as well as the East Brunswick Defendants' Motion for Summary Judgment on Plaintiff's failure to intervene claim. For the reasons that follow,

---

[1] Plaintiff also asserts related excessive force and failure to intervene claims under the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 *et seq*.

Trooper Robertson's Motion for Summary Judgment is DENIED, and the East Brunswick

Defendants' Motion for Summary Judgment is GRANTED.

## **BACKGROUND**

The following facts are undisputed, except where noted. This matter arises out of an

automobile stop and subsequent arrest. At approximately 11:09 p.m. on the evening of July 11,

2015, East Brunswick Police Officers Danese and Jun, while on patrol in an unmarked police

vehicle, observed Plaintiff driving on Route 18 South in East Brunswick, New Jersey.

Deposition Transcript of Alexander Danese ("Danese Dep."), at 15:22-16:4; Trooper

Robertson's Undisputed Statement of Material Facts ("RSMF") ¶ 3; Plaintiff's Response to

RSMF ("PRSMF") ¶ 3. Plaintiff testified that, at the time he was spotted by Officers Danese and

Jun, he was driving home from a video game tournament held at a church in Somerset, New

Jersey. Deposition Transcript of Richard Monticciolo ("Monticciolo Dep."), at 16:18-23.

According to the testimony of Officer Danese, after observing Plaintiff's vehicle "failing to

maintain its line rather badly," Officers Danese and Jun decided to pull Plaintiff over on

suspicion that Plaintiff could be under the influence of drugs or alcohol. Danese Dep. 15:22-

16:4.

After activating the emergency lights on their patrol vehicle, Officers Danese and Jun

pulled Plaintiff over in the parking lot of a retail establishment. Monticciolo Dep. 19:6-12;

Danese Dep. 15:3-16. Plaintiff testified that he felt uncomfortable as Officers Danese and Jun

approached his vehicle, because they were not wearing uniforms or any other articles of clothing

identifying themselves as police officers, and were in a foreign, unmarked car. Monticciolo Dep.

25:8-27:6. Believing Officers Danese and Jun were "thugs," rather than actual law enforcement

officers, Plaintiff accelerated out of the parking lot and back onto Route 18. *Id.* at 26:22-27:7;

RSMF ¶¶ 7-8; PRSMF ¶¶ 7-8.  Officers Danese and Jun reentered their vehicle and pursued

Plaintiff for sixth-tenths of a mile down the road, where Plaintiff pulled into a gas station parking

lot.  Danese Dep. 27:10-29:25.  Officers Danese and Jun followed Plaintiff into the parking lot,

and Plaintiff parked his vehicle in front of the entrance to a convenience store, to the right of

another parked vehicle.  *Id.* at 29:22-25; 30:6-21.

While traveling along Route 18, following a work detail at a Taylor Swift concert at

MetLife Stadium, Trooper Robertson observed Officer Danese and Jun's vehicle in the retail

store's parking lot, and noticed that the police vehicle's emergency lights were activated, despite

the fact that there was no car in front of it.  Deposition Transcript of Trooper Robertson

("Robertson Dep."), at 53:7-18; 55:12-19; RSMF ¶¶ 13-14; PRSMF ¶¶ 13-14.  Shortly

thereafter, Trooper Robertson witnessed Officers Danese and Jun pass him at high rate of speed,

with the emergency sirens on their vehicle activated.  Robertson Dep. 55:22-25; 56:18-19;

RSMF ¶ 15; PRSMF ¶ 15.  Trooper Robertson decided to provide backup, and pulled into the

gas station, positioning his vehicle alongside Officer Danese and Jun, approximately two car

lengths behind Plaintiff's vehicle.  Robertson Dep. 67:15-68:8; RSMF ¶¶ 16-17; PRSMF ¶¶ 16-

17.

Upon parking his vehicle, Trooper Robertson observed Officers Danese and Jun crouched

behind the cover of their vehicle's doors, shouting commands at Plaintiff with their guns drawn.

Robertson Dep. 68:9-70:17; RSMF ¶ 18; PRSMF ¶ 18.  Trooper Robertson testified that based

on his experience and training, he considered the situation a "high risk stop," and had reason to

believe that Plaintiff was armed and dangerous.  Robertson Dep. 69:4-71:4.  Accordingly,

Trooper Robertson exited his vehicle with his police canine, Scales.  *Id.* at 81:15-20; RSMF ¶ 20;

PRSMF ¶ 20.  At approximately 11:11 p.m., Lt. Plaskon arrived on the scene as back-up, parking

his car at the exit of the gas station parking lot. Deposition Transcript of Lt. Michael Plaskon ("Plaskon Dep."), at 5:10-22. Lt. Plaskon's vehicle was equipped with a dash board camera, which recorded much of the incident.[2] RSMF ¶ 21; PRSMF ¶ 21.

The Court prefaces its recital of the subsequent facts by noting that this was not a protracted arrest. Rather, the events that transpired from the time Plaintiff exited his vehicle, to the time he was restrained in handcuffs, occurred over approximately thirty-five seconds. Thus, while I relate a scene-by-scene narrative of the arrest, I emphasize that the following conduct took place over a matter of seconds.

After pulling into the parking lot and exiting their patrol car, Officers Danese and Jun ordered Plaintiff to exit his vehicle. Danese Dep. 39:16-40:2; RSMF ¶ 23; PRSMF ¶ 23. Plaintiff exited the vehicle with his hands held above his head, and faced the officers, who were positioned to the rear of Plaintiff's vehicle. MVR at timestamp 23:11:50-56. Plaintiff then closed the front door of his vehicle, and, with his hands held above his head, side-stepped between his vehicle and the vehicle parked to his left, in the direction of the officers. *Id.* at

---

[2] Much, but not all, of the incident at issue in this matter was captured by the dashboard camera positioned on Lt. Plaskon's vehicle. The resulting videotape is referred to by the parties as the "Mobile Video Recording," or "MVR." The parties do not allege that the MVR was "doctored or altered in any way, nor [contend] that what it depicts differs from what actually happened" in this case. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Because the MVR is the best evidence of what happened in this case, the Court need not make credibility determinations concerning the testimony of Defendants, as would be inappropriate on summary judgment in any case, nor will it draw inferences in Plaintiff's favor that are inconsistent with the events depicted in the videotape which captures the events giving rise to Plaintiff's excessive force claim. *See id.* at 380–81 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . [and thus,] the Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *see also Shuman v. Raritan Twp.*, No. 14-3658, 2016 WL 7013465, at *2 (D.N.J. Nov. 30, 2016). Accordingly, wherever possible, the Court has relied upon the MVR videotape to state the facts of the case.

23:11:56-23:12:08.  Upon reaching the rear of his vehicle, Plaintiff briefly stopped and turned his back to the officers, with his hands held above his head.  *Id.* at 23:12:08-12.  During this time, the officers can be heard commanding Plaintiff to get down on the ground, which Plaintiff does not do.  *Id.*  Next, the MVR depicts Plaintiff making a half-turn towards the officers, despite their repeated protests to get down on the ground.  *Id.* at 23:12:12-14.

At approximately 11:12 p.m., the MVR portrays Plaintiff in a sideways stance, with his torso facing Lt. Plaskon's vehicle at the entrance of the parking lot, his hands held above his shoulders in a position of surrender, and his head turned towards the officers.  *Id.* at 23:12:16.  At this time, Trooper Robertson and Scales enter the frame, the first officers visible on the MVR.  *Id.*  Trooper Robertson is straddling Scales, with one hand holding Scales' collar, and the other hand pointing at Plaintiff.  *Id.* at 23:12:16-18.

As Officer Danese enters the frame and approaches Plaintiff on his left side, Plaintiff voluntarily gets down on his right knee.  *Id.* at 23:12:17-18.  Officer Danese then grabs ahold of Plaintiff's left arm with one hand, and places the other on Plaintiff's back, guiding him to the ground.  *Id.* at 23:12:18-19.  Officer Danese lowers his right knee on Plaintiff's back, restraining Plaintiff face-down in the prone position, and Officer Jun approaches Plaintiff.  *Id.* at 23:12:20.  At this time, Trooper Robertson and Scales were positioned directly to the right side of Plaintiff's body, and Lt. Plaskon exited his vehicle to approach Plaintiff.  *Id.*  Officer Jun approached the front of Plaintiff's body, placed the weight of his right knee on Plaintiff's shoulder and neck, and attempted to secure Plaintiff's right arm.  *Id.* at 23:12:21-22.

A split second later, Scales bit the lower part of Plaintiff's right leg for approximately three seconds.  *Id.* at 23:12:22-25.  It is undisputed that Trooper Robertson did not issue a verbal warning prior to ordering Scales to apprehend Plaintiff.  Robertson Dep. 85:22-86:19.  Trooper

Robertson testified that the State Police Canine Guidelines (the "Canine Guidelines") state that, whenever possible, a police canine handler should allow a suspect to surrender, prior to ordering a canine apprehension, by issuing an audible warning. *Id.* at 44:14-45:9; 52:17-53:6. To that end, the Canine Guidelines state as follows:

> 4.    Whenever possible, the handler shall allow the suspect to surrender by giving an announcement prior to releasing their canine partner for an apprehension. The following audible canine warning announcement is an example: "**Police, you are under arrest. Stop or my dog will bite you.**"

Trooper Robertson's Mot. for Summ. J., Ex. E. Trooper Robertson further testified that the warning should be given unless it would risk "injury or escape." Robertson Dep. 44:14-45:3.

Importantly, the parties dispute whether the officers were able to fully restrain Plaintiff before Trooper Robertson commanded Scales to apprehend Plaintiff.[3] Specifically, while it is undisputed that Officer Danese was able to restrain Plaintiff's left arm with handcuffs before Scales apprehended Plaintiff, Robertson Dep. 98:3-6, the parties offer different views on Plaintiff's right hand, which rests against his right side, and out of view of the MVR, during the incident. Trooper Robertson testified that he lost sight of Plaintiff's right hand as it went under Plaintiff's body and "towards his waist area," which resulted in Trooper Robertson's command to Scales to apprehend Plaintiff. Robertson Dep. 86:12-87:16. Trooper Robertson further testified that while he did not specifically see anything in Plaintiff's waistband, it was

---

[3] While it is unclear, based on the Court's review of the MVR, when Trooper Robertson directed Scales to apprehend Plaintiff, the parties do not dispute that such a command was given. RSMF ¶ 20; PRSMF ¶ 20. In that regard, the parties did not identify, and it is unclear from the audio provided in connection with the MVR, the precise moment when such a command was given. To the contrary, the MVR appears to depict Trooper Robertson grasping for Scales as he escapes Trooper Robertson's grip and apprehends Plaintiff. However, because the parties do not dispute that Trooper Robertson **directed** Scales to apprehend Plaintiff, and the MVR does not conclusively prove otherwise, the Court is constrained, for the purposes of this Motion, to accept the parties' stipulation that Trooper Robertson directed Scales to apprehend Plaintiff.

"unknown" whether Plaintiff had anything in the waistband, and, based on the "totality of the whole situation that took place," he believed that Plaintiff was "armed and dangerous." *Id.* at 98:11-99:5. Nonetheless, Trooper Robertson admitted that he had no confirmation regarding whether Plaintiff was armed prior to issuing the command to Scales, that Plaintiff never pointed a weapon, and that Plaintiff's hand only reached down towards his waistband for a "second or two." *Id.* at 98:11-99:12. Trooper Robertson testified that he gave the command to Scales as soon as Plaintiff reached for his waistband. *Id.* at 98:25-99:4.

Plaintiff denies that his right hand moved under his body to his waistband, testifying that his hands were by his side prior to the officers gaining control of them and handcuffing him. Monticciolo Dep. 45:10-19; PRSMF ¶¶ 35-38. Plaintiff testified that he was handcuffed contemporaneously with the dog bite, Monticciolo Dep. 48:1-8, and agreed with Officer Danese's testimony that only five to seven seconds elapsed between the time Plaintiff got on the ground until he was fully handcuffed, and that Plaintiff did not "actively pull[] away" or otherwise resist Officer Jun's attempts to restrain Plaintiff's right hand. Danese Dep. 66:20-67:9. In support of his allegation that he did not resist arrest, Plaintiff also cites Officer Jun's testimony that Plaintiff did not resist or pull away when Officer Jun grabbed Plaintiff's right arm. Deposition Transcript of Kye Jun ("Jun Dep."), at 35:19-36:2.[4]

---

[4] The East Brunswick officers' testimony regarding Plaintiff's right hand does not conclusively corroborate either Plaintiff or Trooper Robertson's allegations. To that end, Officer Jun testified that, as he approached Plaintiff and placed his knee on Plaintiff's shoulder, his positioning caused him to lose sight of Plaintiff's right hand. Jun Dep. 20:25-21:22. Additionally, while Officer Danese testified that he saw Plaintiff's right hand lying towards Plaintiff's waistband, he further testified that he could not see what Plaintiff was doing with the hand, including whether or not Plaintiff attempted to grab something in his waistband, or whether Plaintiff's hand went under his body. Danese Dep. 62:6-63:25. Accordingly, neither the MVR nor the other officers' testimony confirms either Plaintiff or Trooper Robertson's allegations regarding Plaintiff's right hand, and therefore, a material dispute of fact exists regarding whether Plaintiff reached for his waistband. That dispute must be resolved by the jury.

Contemporaneously with the dog bite, the officers restrained Plaintiff in handcuffs, and Plaintiff apologized for not remaining stopped at the retail establishment, exclaiming, "I didn't know you guys were undercover," MVR at 23:12:25-29, and "I swear to God, I thought you were going to mug me. I thought – I didn't realize you guys were undercover." *Id.* at 23:12:42-47. After Plaintiff's explanation, Trooper Robertson apologized for the dog bite, and Lt. Plaskon requested an ambulance to treat Plaintiff. *Id.* at 23:12:50-56; Robertson Dep. 110:4-13.

## PROCEDURAL HISTORY

On November 18, 2015, Plaintiff filed his Complaint, alleging constitutional claims pursuant to § 1983, as well as state law claims under the NJCRA. *See* Compl., ECF No. 1. Count One alleges that Trooper Robertson violated Plaintiff's Fourth Amendment right to be free from excessive force and his Fourteenth Amendment Right to due process. *Id.* at 4. Count Two asserts a related claim against the East Brunswick Defendants for failure to intervene against the alleged excessive force used by Trooper Robertson. *Id.* Count Three asserts that Trooper Robertson's use of excessive force, and the East Brunswick Defendants' failure to intervene, deprived Plaintiff of his due process rights under the NJCRA. *Id.* at 4-5.

On March 24, 2017, Trooper Robertson moved for summary judgment on the grounds that the use of force was reasonable, and on the basis of qualified immunity. Trooper Robertson's Mot. for Summ. J., ECF No. 24. On the same day, the East Brunswick Defendants also moved for summary judgment, contending that Plaintiff has failed to prove his claim for failure to intervene, and asserting their entitlement to qualified immunity. East Brunswick Defs.' Mot for Summ. J., ECF No. 23. Both of those Motions have been fully briefed. ECF Nos. 27-29.

## LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

However, the Supreme Court has instructed that, in qualified immunity cases, the existence of a videotape recording presents an "added wrinkle" to the general standard requiring the court to construe facts in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). In that regard, "[w]here there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'" *Knight v. Walton*, 660 F. App'x 110, 112 (3d Cir. 2016) (quoting *Scott*, 550 U.S. at 380–81). The ability to rely on video evidence is important in the present case, because much of the encounter, including the deployment of Scales, is captured on video.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322. Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson*, 79 F.3d at 1366; *see Gleason v. Norwest Mortg. Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Not every issue of fact is sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Additionally, the nonmoving party cannot rest upon mere allegations; he or she must present actual evidence that creates a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. In conducting a review of the facts, the nonmoving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks v. Kyler*, 204 F.3d 102, 105, n.5 (3d Cir. 2000); *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## DISCUSSION

### I.    EXCESSIVE FORCE CLAIM AGAINST TROOPER ROBERTSON

In Count One of the Complaint, Plaintiff alleges that Trooper Robertson used excessive force, in violation of the Fourth Amendment, by ordering Scales to apprehend Plaintiff. Trooper

Robertson moves for summary judgment on Plaintiff's excessive force claim, arguing that he employed a reasonable amount of force, and, even if the force used was not objectively reasonable, he is nonetheless entitled to qualified immunity.

## A.    Qualified Immunity Overview

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When properly applied, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  To overcome qualified immunity, a plaintiff must plead facts sufficient to show that:  (1) the official violated a statutory or constitutional right; and (2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232; *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 168-69 (3d Cir. 2016).  A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted).  The Court has discretion to approach these steps in the sequential order that it deems "most appropriate for the particular case before [it]." *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015); *see Pearson*, 555 U.S. at 236.  Finally, the burden of proving the affirmative defense of qualified immunity rests on the party seeking to invoke it.  *See Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006); *Hicks v. Feeney*, 850 F.2d 152, 159 (3d Cir. 1988).

## B.    Qualified Immunity – Trooper Robertson

### 1. *Plaintiff's Fourth Amendment Right to be Free from an Unreasonable Seizure*

The first step in the Court's qualified immunity analysis is to identify whether the facts of this case, taken in the light most favorable to Plaintiff, show that Trooper Robertson violated a specific constitutional right belonging to Plaintiff. *Santini*, 795 F.3d at 417. The Supreme Court has held that all claims alleging excessive force in the context of an arrest, investigatory stop, or seizure must be "analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. To prevail on a Fourth Amendment excessive force claim, "a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *Lamont v. New Jersey*, 637 F.3d 177, 182–83 (3d Cir. 2011). A seizure occurs "[w]henever an officer restrains the freedom of a person to walk away . . . ." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Here, because there is no dispute that a seizure occurred when the officers arrested Plaintiff, the critical question for the Court is whether, in light of the circumstances confronting him, Trooper Robertson employed an unreasonable amount of force to arrest Plaintiff.

To determine reasonableness in excessive force cases, courts within the Third Circuit ask "whether under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Graham*, 490 U.S. at 397); *see also Santini*, 795 F.3d at 417 ("[W]e employ a 'totality of the circumstances' approach for evaluating objective reasonableness."). In assessing objective reasonableness, courts balance the "nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests at stake." *Graham*, 490

U.S. at 396 (internal quotation marks and citation omitted).  While the objective reasonableness

inquiry is individualized and fact specific, the Supreme Court has provided three general factors

to guide the Court's inquiry:  (1) "the severity of the crime at issue"; (2) "whether the suspect

poses an immediate threat to the safety of the officers or others"; and (3) whether the suspect "is

actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396; *see*

*Garner*, 471 U.S. at 8-9; *Santini*, 795 F.3d at 417.  "Other relevant factors include the possibility

that the persons subject to the police action are themselves violent or dangerous, the duration of

the action, whether the action takes place in the context of effecting an arrest, the possibility that

the suspect may be armed, and the number of persons with whom the police officers must

contend at one time."  *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).  While some courts

consider "only the facts and circumstances at the precise moment that excessive force is

applied," courts within the Third Circuit take into account "all of the relevant facts and

circumstances leading up to the time that the officers allegedly used excessive force."  *Rivas,* 365

F.3d at 198.

   The objective reasonableness of a particular use of force is evaluated from "the

perspective of the officer at the time of the incident and not with the benefit of hindsight."

*Santini*, 795 F.3d at 417; *see Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use

of force must be judged from the perspective of a reasonable officer on the scene, rather than

with the 20/20 vision of hindsight.").  Thus, within the context of an excessive force claim, the

"standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later

seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."

*Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Rather, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "The reasonableness of the use of force is normally an issue for the jury." *Rivas*, 365 F.3d at 198.

Here, Plaintiff's excessive force claim is limited to Trooper Robertson's use of the police dog, Scales, to effectuate the arrest. Specifically, Plaintiff argues that Trooper Robertson used excessive force by directing Scales to apprehend Plaintiff, while Plaintiff was face down on the ground, immobilized by two other officers. Plaintiff contends that the use of Scales was unreasonable, because Plaintiff: (1) was not resisting arrest or attempting to flee; but rather, approached the officers with his hands held above his head, and voluntarily proceeded to get down on the ground; (2) was, at a minimum, partially restrained at the time Trooper Robertson directed Scales to apprehend him, as he was in the prone position, with his left arm fully restrained and two officers kneeling on his back; and (3) did not reach for his waistband while on the ground.

In opposition, Trooper Robertson argues that ordering Scales to apprehend Plaintiff was not an unreasonable use of force, because, based on the totality of the circumstances, it was reasonable for Trooper Robertson to believe that Plaintiff was armed and dangerous, and posed an immediate threat to the safety of the public and the other officers. Specifically, Trooper Robertson testified that, after observing the East Brunswick Defendants pursue Plaintiff into the parking lot at a high rate of speed and exit the vehicle with their guns drawn, he concluded that the incident at issue was a "high risk" stop. Robertson Dep. 69:4-71:4. Additionally, Trooper Robertson contends that it was reasonable for him to believe that Plaintiff was dangerous,

because Plaintiff failed to comply with the officers' orders to get down on the ground, and, once on the ground, Trooper Robertson observed Plaintiff's right hand move under his body and towards his waistband.

Within the Third Circuit, "[u]se of a police dog to bite and hold a suspect is not *per se* unreasonable." *Moore v. Vangelo*, 222 F. App'x 167, 170 (3d Cir. 2007). In *Vangelo*, the Third Circuit considered whether an officer used excessive force in ordering his police dog to bite and hold the plaintiff, who, at the time the officer arrived on the scene, was attempting to break up a fight between two other individuals. *Id.* at 169. Upon arriving at the scene of the altercation, the officer attempted, without success, to verbally warn the combatants to stop fighting. *See id.* The men ignored the officer's warnings, and "[u]nable to cope with the three perceived combatants alone," the officer instructed his police dog to bite and hold the plaintiff. *Id.* The dog bit the plaintiff on the right forearm until he was ordered off by the officer, who then arrested the plaintiff. *Id.* Subsequently, the plaintiff sued the officer pursuant to § 1983, asserting that the officer violated his Fourth Amendment right to be free from excessive force. *Id.* Applying the *Graham* reasonableness factors, the district court found that the officer was entitled to qualified immunity, because the deployment of a police dog was a reasonable use of force in response to a violent fight, lasting several minutes, where the participants did not respond to verbal orders and the officer was outnumbered three to one. *See Moore v. Vangelo*, No. 03-4718, 2005 WL 2178885, at *7 (E.D. Pa. Sept. 6, 2005), *aff'd*, 222 F. App'x 167 (3d Cir. 2007).

In affirming the district court's decision granting summary judgment to the officer on the basis of qualified immunity, the Third Circuit explained that while "police dogs can—and often do—cause serious harm,' . . . the use of K–9 force to apprehend suspects where the *Graham* factors weigh in favor of the police is reasonable." *Vangelo*, 222 F. App'x at 170 (quoting *Vera*

*Cruz v. City of Escondido*, 139 F.3d 659, 661 (9th Cir. 1997)).  Applying the *Graham* factors in

that case, the Third Circuit found that the officer's decision to deploy his police dog was

objectively reasonable, because:  (1) the officer "was confronted with a dangerous situation

where the safety of officers and others was at risk"; (2) the "melee going on before him was an

ongoing assault"; and (3) "[t]hree people were involved in the fight and [the officer] was, at least

temporarily, alone." *Vangelo*, 222 F. App'x at 171.  Accordingly, because the *Graham* factors

supported the officer's decision to use a police dog, the Third Circuit found that the officer was

entitled to qualified immunity.  *Id.*

      At the outset, I note that, that in deciding whether Trooper Robertson is entitled to

summary judgment on the basis of qualified immunity, I must construe all facts and inferences in

favor of Plaintiff.  *Santini*, 795 F.3d at 417.  Nonetheless, I am also mindful of the fact that the

events leading up to Plaintiff's arrest unfolded rapidly, occurring within the thirty-five seconds

that elapsed from the time Plaintiff exited his vehicle to the time he was fully restrained in

handcuffs.  Therefore, in analyzing whether, under Plaintiff's depiction of the facts, the force

employed by Trooper Robertson was reasonable, this Court must heed the Third Circuit's

instruction that "Monday morning quarterbacking is not allowed." *Lamont*, 637 F.3d at 183.

      Guided by the Third Circuit's opinion in *Vangelo*, the Court must apply the *Graham*

factors to determine whether a reasonable jury could conclude that it was not objectively

reasonable for Trooper Robertson to order Scales to apprehend Plaintiff, where, at the time of the

command, Plaintiff was immobilized face down in the prone position with two officers kneeling

on his back, outnumbered four to one by the police officers, and neither actively resisting arrest

nor a flight risk.  Applying those factors, the Court finds that a reasonable jury could conclude

that Trooper Robertson's deployment of Scales was not "objectively reasonable" under the circumstances.[5]

I turn first to the severity of the crime factor. The undisputed facts in connection with the severity of the crime factor are that: (1) Officers Danese and Jun suspected Plaintiff of driving under the influence; (2) Trooper Robertson did not communicate with Officers Danese and Jun regarding Plaintiff's suspected offense prior to ordering Scales to apprehend Plaintiff; (3) Plaintiff was: (a) charged with resisting arrest, possession of marijuana, possession of paraphernalia, and eluding; and (b) issued summonses for reckless driving, possessing a controlled dangerous substance in a motor vehicle, careless driving, failure to maintain lanes, and failure to comply with officers; and (4) the charges brought against Plaintiff were resolved by way of Plaintiff receiving a conditional discharge for possession of marijuana, and dismissal of all remaining charges.

The Third Circuit has held that, in weighing the severity of the crime at issue, courts determine whether, under the plaintiff's averment of the facts, a reasonable jury could find that the severity of crime factor weighs in the plaintiff's favor. *See Santini*, 795 F.3d at 419. In *Santini*, several police officers arrived at the plaintiff's farm for investigatory purposes, without any suspicion that the plaintiff himself had engaged in criminal activity. *See id.* However, after

---

[5] In finding that a reasonable jury could conclude that Trooper Robertson's use of force was unreasonable, the Court does not suggest that Trooper Robertson in fact acted unreasonably, or that police officers are not permitted to use police canines when attempting to arrest a suspect. *See Green v. New Jersey State Police*, 246 F. App'x 158, 161 (3d Cir. 2007). Rather, the Court finds that, under the undisputed facts, and accepting that Plaintiff did not reach for his waistband, a jury could conclude that Trooper Robertson's use of force was not objectively reasonable. However, because a material dispute of fact exists regarding whether Plaintiff reached for his waistband while on the ground, and that fact may be probative as to whether Trooper Robertson's use of force was objectively reasonable, the ultimate decision regarding whether Trooper Robertson violated Plaintiff's constitutional rights by using excessive force is left to the factfinder.

engaging in an altercation with the officers, the plaintiff was charged with aggravated assault. *See id.* Nonetheless, because the plaintiff alleged that he did not commit that offense, and the aggravated assault charge was ultimately dropped, the court held that a "a reasonable jury could find that the severity of crime factor weighs in his favor." *Id.* Similarly, here, while Plaintiff was charged with, *inter alia*, resisting arrest, Plaintiff denies that he committed that offense, and the resisting arrest charge was subsequently dropped. Ultimately, Plaintiff only received a conditional discharge for possession of marijuana. Accordingly, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the severity of the crime factor did not support Trooper Robertson's use of force.

Under Plaintiff's averment of the facts, a reasonable jury could also find that the imminent threat factor weighs in Plaintiff's favor. In that regard, Plaintiff was not suspected by the East Brunswick officers of committing a violent offense, and Plaintiff alleges that, prior to Trooper Robertson's order to Scales, he complied with the officers' orders to get down on the ground. Indeed, while Plaintiff may have initially disobeyed the officers' orders to get on the ground, the MVR shows that Plaintiff was demonstrably compliant prior to Trooper Robertson's use of force, voluntarily proceeding to the ground. MVR at 23:12:17-18. Plaintiff also avers that he did not resist arrest, reach for his waistband, lash out at the officers, or take any other actions indicating the potential for violence. Moreover, it is undisputed that, at the time of Trooper Robertson's direction to Scales, Plaintiff was face down in the prone position, with his left hand fully restrained and two officers kneeling on his back. Therefore, to the extent that Plaintiff's right hand was unrestrained, but did not reach for his waistband, prior to Trooper Robertson's command, a jury could find that an objectively reasonable officer in Trooper Robertson's position would not have perceived the right hand as a threat. *See Santini*, 795 F.3d

at 420 (finding that a reasonable jury could conclude that the plaintiff's failure to obey the officer's orders to keep his hands in his pockets did not warrant the use of pepper spray, in light of the "absence of other facts suggesting that [the plaintiff] was armed or otherwise posed a threat to officer safety."). Under those circumstances, a reasonable jury could conclude that Plaintiff did not pose an imminent threat to the officers or the public, and thus, the second *Graham* factor tips in Plaintiff's favor.

Similarly, a reasonable jury could conclude that, under the third *Graham* factor, Plaintiff was not attempting to resist arrest or flee at the time Trooper Robertson ordered Scales to apprehend Plaintiff. The only alleged act of resistance identified by Trooper Robertson was Plaintiff's initial failure to comply with the officers' orders to get down on the ground. While Plaintiff did not immediately get down on the ground, by the time Officer Danese approached Plaintiff – and before Trooper Robertson commanded Scales to apprehend Plaintiff – Plaintiff alleges that he voluntarily assumed the prone position, and the MVR demonstrates that Plaintiff at least got down on one knee. MVR at 23:12:17-18. Indeed, by the time Trooper Robertson directed Scales to apprehend Plaintiff, Plaintiff was face down on the ground, with his left arm fully restrained by Officer Danese, who had also secured Plaintiff to the ground by placing his knee on Plaintiff's back. *Id.* at 23:12:20. Officer Jun had also approached Plaintiff at that juncture, and was straddling Plaintiff's neck and shoulder, in the process of restraining Plaintiff's right arm. *Id.* at 23:12:21-22. Moreover, Officers Danese and Jun testified that Plaintiff did not resist Officer Jun's attempt to restrain Plaintiff's right arm. Danese Dep. 66:20-67:9; Jun Dep. 35:19-36:2. At that point, a jury could conclude that no reasonable officer would believe that Plaintiff was actively resisting arrest or attempting flight. Accordingly, a reasonable jury could conclude that the final *Graham* factor weighs in Plaintiff's favor, and thus, that Trooper

Robertson's use of force under these circumstances was not objectively reasonable. *See Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006) (finding excessive force was used, where "[t]here was no evidence that [the plaintiff] was resisting arrest or attempting to flee" at the time the force was used); *Castellani v. City of Atl. City*, No. 13-5848, 2017 WL 3112820, at *14 (D.N.J. July 21, 2017) (holding that the officer's conduct was objectively unreasonable under the *Graham* factors, because "a reasonable jury could . . . find that [the officer] unreasonably came in after [the plaintiff] was restrained and unleashed his K9 to attack [the plaintiff] . . . after Plaintiff was already subdued by five officers on the ground and offering no resistance.").

Trooper Robertson's testimony that he saw Plaintiff's right hand reach towards his waistband does not alter the Court's reasonableness finding, because a material dispute of fact exists regarding whether Plaintiff reached for his waistband, and the Court is bound, on this motion for summary judgment, to accept as true Plaintiff's allegation that he never reached towards his waistband. To that end, Plaintiff's allegation that he did not reach for his waistband is not contradicted by the MVR, because his right arm is not fully visible in the MVR. Additionally, the testimony of the other officers regarding whether or not Plaintiff reached for his waistband is inconclusive; Officer Jun did not see Plaintiff's right hand, and Officer Danese's testimony is ambiguous as to whether Plaintiff moved his hand towards his waistband. Jun Dep. 20:25-21:22; Danese Dep. 62:6-63:25. Therefore, to the extent that Trooper Robertson testified that he saw Plaintiff's right hand move towards his waistband, that is a disputed fact which must be resolved by a jury, and thus, cannot factor into this Court's reasonableness analysis.

A reasonable jury could also conclude that, under the additional *Sharrar* factors, Trooper Robertson's use of force was not objectively reasonable. As previously stated, under Plaintiff's averment of the facts, a reasonable jury could conclude that Plaintiff was not violent, armed, or

dangerous, because, at the time Trooper Robertson ordered Scales to bite Plaintiff, Plaintiff was restrained in the prone position, compliant with the officers' orders, neither resisting arrest nor attempting to flee, and did not reach for his waistband. Additionally, while Trooper Robertson's actions took place in the context of effectuating an arrest, Plaintiff alleges that he was suspected of a nonviolent crime. With respect to the duration of the force, this is not a case where an officer employed a canine to bite and hold a suspect that was resisting arrest or attempting to flee. Rather, that Scales only apprehended Plaintiff's leg for a period of three seconds suggests that a reasonable jury could conclude that the use of a canine was wholly unnecessary to effectuating the arrest. Indeed, it is undisputed that the officers were able to fully restrain both of Plaintiff's hands, placing them in handcuffs, within ten seconds of Plaintiff assuming the prone position. A reasonable jury considering those facts, coupled with the additional facts that there were four officers present on the scene to effectuate the arrest of one individual, and that Trooper Robertson did not issue a verbal warning prior to directing Scales to apprehend Plaintiff, could conclude that Trooper Robertson's use of force was not objectively reasonable.

Moreover, the Court notes that this case differs greatly from the situation confronting the officers in *Vangelo* and *Jarrett v. Town of Yarmouth*, 331 F.3d 140 (1st Cir. 2003), two cases on which Trooper Robertson relies. As previously explained, unlike in *Vangelo*, where the officer encountered an ongoing physical altercation, and was outnumbered three to one by the combatants, here, at the time Trooper Robertson deployed Scales, Plaintiff was outnumbered four to one by police officers, was not engaged in a violent struggle, and he was not actively resisting arrest. To the contrary, a reasonable jury could conclude that as the incident progressed, any potential threat presented by Plaintiff decreased; Plaintiff did not attempt to resist arrest or flee the scene at any point during the arrest, held his hands up in a position of

surrender, and, after initially disobeying orders to get down on the ground, voluntarily assumed the prone position. Furthermore, it is undisputed that the East Brunswick Defendants never asked for Trooper Robertson's assistance during the course of effectuating Plaintiff's arrest. Robertson Dep. 80:1-4; Danese Dep. 41:18-42:6, 50:17-19; 63:4-6, 67:22-23, 112:17-112:25.

Additionally, this case differs from *Jarrett*, where the First Circuit found that an officer's decision to order a police dog to apprehend the plaintiff-suspect was not unreasonable. *See Jarrett*, 331 F.3d at 150-51. By the time it reached the First Circuit, that case had proceeded before a jury, which had found that, at the time the officer released the canine, the officer believed that the plaintiff was the suspect in an armed robbery, and had observed the plaintiff flee the scene of a minor traffic violation by vehicle, before exiting his vehicle, scaling a fifteen foot fence, and racing through a residential neighborhood to avoid arrest. *Jarrett*, 331 F.3d at 149. The officer located the plaintiff after twenty minutes of searching, and, after the plaintiff refused to obey three verbal orders to "[s]top, . . . or "I'll send the dog," the officer directed the dog to bite and hold the plaintiff. *Id.* The dog bit and held the plaintiff's leg for a period of thirty seconds, until the officer arrived and commanded the dog to release. *Id.*

Weighing the *Graham* factors, the *Jarrett* court concluded that the officer's use of force did not violate the plaintiff's Fourth Amendment rights, because the use of a police dog was not objectively unreasonable under the circumstances. *Id.* at 150. Specifically, the court noted that the plaintiff was attempting to evade arrest by flight when the officer released the dog, and, that plaintiff's erratic behavior while fleeing by car, including slamming into a cement post, confirmed the officer's belief that the plaintiff was a suspect in a prior armed robbery. *See id.* Because of these actions, as well as the fact that it was dark at the time of the chase, that the officer could not discern whether the plaintiff was armed, and that the plaintiff fled to a

residential area, the First Circuit explained that it was reasonable for the officer to conclude that the plaintiff posed a safety threat to members of the residential neighborhood. *See id.* Accordingly, the court found that the officer's decision to release the dog was not "objectively unreasonable force under the circumstances." *Id.* at 150.

Conversely, in the instant case, a jury applying the *Graham* reasonableness factors could conclude that Plaintiff's use of force was not objectively reasonable. Unlike the plaintiff in *Jarrett*, here, Plaintiff was not attempting to evade arrest by flight when Trooper Robertson released Scales, but rather, had voluntarily assumed the prone position. Additionally, the arrest in this case occurred in a public parking lot, where Plaintiff was outnumbered four to one by police officers, and Trooper Robertson did not issue any verbal warnings prior to ordering Scales to apprehend Plaintiff. Under these circumstances, a jury could find that no reasonable police officer would believe that Plaintiff posed a safety threat. Furthermore, unlike in *Jarrett*, where the First Circuit determined the officer's entitlement to qualified immunity *after* the jury had rendered findings of fact, here, at the summary judgment stage, the Court is bound to accept the factual allegations of Plaintiff as true. Accordingly, *Vangelo* and *Jarrett* are inapposite.

In sum, under the circumstances alleged by Plaintiff, a reasonable jury could conclude that Trooper Robertson violated Plaintiff's Fourth Amendment right to be free from excessive force by deploying Scales to apprehend Plaintiff. Because a reasonable jury could conclude that Trooper Robertson's use of force was not "objectively reasonable" under these circumstances, Plaintiff has satisfied the first step of the qualified immunity analysis.

### 2. Clearly Established Right

Having determined that a reasonable jury could conclude that Trooper Robertson's conduct in directing Scales to apprehend Plaintiff – while Plaintiff was immobilized in the prone

position, outnumbered by four to one by police officers, and neither actively resisting arrest nor a flight risk – was not "objectively reasonable," the Court turns to whether it was clearly established, at the time of Trooper Robertson's conduct, that releasing a police dog under such circumstances violated the Fourth Amendment. In that regard, at the second step of its qualified immunity analysis, the Court must "identify the right at issue and determine if that right was clearly established at the time of the officer's action." *Estep v. Mackey*, 639 F. App'x 870, 873 (3d Cir. 2016). "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Luna*, 136 S. Ct. at 308). A right is clearly established where, at the time of the challenged conduct, the contours of the right are "sufficiently clear 'that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In other words, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).[6]

---

[6] Like the reasonableness inquiry conducted in step one of the qualified immunity analysis, the step two reasonableness inquiry is "objective and fact specific." *Santini*, 795 F.3d at 417. Nonetheless, the step two analysis is distinct from step one, because the purpose of the step two inquiry is "to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. Stated differently:

> [T]he first step of the analysis addresses whether the force used by the officer was excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the officer at the time. This is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity. The second step is the immunity analysis and addresses whether, if there was a wrong, such as the use of

While a case directly on point is not required,[7] "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Stated differently, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001). "Such precedent must come either from the Supreme Court or a 'robust consensus of cases of persuasive authority in the Court of Appeals.'" *In Re: J & S Properties, LLC*, No. 16-3366, 2017 WL 4294065, at *4 (3d Cir. Sept. 28, 2017) (quoting *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 69 (3d Cir. 2016)).

In determining whether a constitutional right has been clearly established, the Court must "define the right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012). Both the Supreme Court and the Third Circuit have repeatedly instructed courts "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742; *see Pauly*, 137 S. Ct. at 551–52 ("Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'") (citation omitted); *Mackey*, 639 F. App'x at 873. "Rather, the right at issue must be framed 'in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition.'" *Mackey*, 639 F. App'x at 873 (quoting *Spady v.*

---

excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit.

*Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007).

[7] Indeed, "[i]n some cases, even though there may be no previous precedent directly on point, an action can still violate a clearly established right where a general constitutional rule already identified in the decisional law applies with obvious clarity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).

*Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015)). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Indeed, within the context of excessive force claims specifically, both the Supreme Court and Third Circuit have emphasized the importance of defining with particularity the clearly established law. *See Pauly*, 137 S. Ct. at 552; *Santini*, 795 F.3d at 417 (observing that the qualified immunity analysis "has more particularized requirements in an excessive force case . . . ."); *Mackey*, 639 F. App'x at 873 (remanding case to the lower court to more specifically identify the right at issue, because the court's formulation of the right "as the Fourth Amendment right to be free from the excessive use of force . . . lack[ed] the required level of specificity and [did] not address the question that needs to be answered in this context because it does not describe the specific situation that the officers confronted."). In *Pauly*, for example, the Supreme Court reversed a denial of qualified immunity, finding that the court below erred in defining the clearly established law pertaining to the plaintiff's excessive force claim at too high a level of generality. *See* 137 S. Ct. at 552-53. In that case, the defendant-officer responded to the plaintiff-suspect's home after a report that the suspect had been involved in a road rage incident earlier that evening. *See id.* at 549. Upon arrival, the officer heard the suspect emerge from his home yelling that he had a gun. *See id.* The officer took cover behind a stone wall, and, after hearing shotgun blasts and seeing the suspect point a handgun in his direction, shot and killed the suspect. *See id.* at 549-50.

In finding that officer violated clearly established law regarding the use of excessive force, by failing to warn the suspect to drop his weapon prior to using deadly force, the Tenth

Circuit Court of Appeals relied solely on the general tests for excessive force set forth in *Graham* and *Garner*. *See id.* at 551. The Supreme Court reversed, finding that the officer did "not violate clearly established law." *Id.* at 552. In so holding, the Court explained that, outside of an "obvious" excessive force case, "*Garner* and *Graham* do not by themselves create clearly established law." *Id.* Because there was not an obvious excessive force violation in that case, the Court found that the Court of Appeals misapplied the "clearly established" analysis by failing to identify "a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* at 552.

Ultimately, qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In recognition of that principle, the Supreme Court has emphasized that, whenever possible, courts should rule on qualified immunity "early in the proceedings so that the costs and expenses of trial are avoided . . . ." *Saucier*, 533 U.S. at 200; *see Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) ("[T]he Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation."). Nonetheless, the Third Circuit has recognized that "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right." *Curley*, 298 F.3d at 278; *see Santini*, 795 F.3d at 420. Thus, "a decision on qualified immunity [is] premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley*, 298 F.3d at 278.

At the outset, the Court finds that because a material dispute of fact exists in this case regarding whether Plaintiff, when prone on the ground, reached for his waistband, an ultimate

decision on qualified immunity would be premature at this juncture. Specifically, while Plaintiff testified that his right hand did not move towards his waistband, Trooper Robertson testified that he saw Plaintiff's right hand moving towards his waistband prior to ordering Scales to apprehend Plaintiff. Because the MVR does not clearly depict Plaintiff's right hand at the time Trooper Robertson issued the command to Scales, the Court must submit that dispute to the jury before rendering a final decision on whether Trooper Robertson's conduct was objectively reasonable. In that regard, to the extent that a factfinder concludes that Trooper Robertson observed Plaintiff reach for his waistband, Trooper Robertson may renew the qualified immunity defense at trial. *See Sharp*, 669 F.3d at 158 ("A party may raise qualified immunity as a defense at trial, especially where the facts are not clear."). Nonetheless, for the purposes of the Court's Opinion today, the Court will consider whether, under the facts as alleged by Plaintiff, Trooper Robertson's conduct violated a clearly established right.

Having set forth the context in which the Court must analyze whether the constitutional right at issue in this case was clearly established, the question presented is whether a reasonable officer in Trooper Robertson's position would have understood that it violated the Fourth Amendment's prohibition against excessive force to order a police dog to apprehend an individual who, at the time the command was given, was immobilized in the prone position by two officers, with his left arm fully restrained, outnumbered four to one by police officers, and who was neither resisting arrest nor a flight risk. The Court finds that, at the time of Trooper Robertson's conduct, it was clearly established, such that a reasonable officer would be on fair notice, that releasing a canine to apprehend Plaintiff under those circumstances would violate the Fourth Amendment's prohibition against excessive force.

The Fourth Amendment does not require officers, such as Trooper Robertson, to rely on verbal instructions alone to effectuate an arrest; especially where, as here, an individual previously failed to comply with verbal instructions. *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Nonetheless, a police officer effectuating an arrest may only use the amount of force that is necessary under the circumstances. *See Thomas v. City of Erie*, 236 F. App'x 772, 776 (3d Cir. 2007) ("A plaintiff may bring a claim pursuant to § 1983 where the police use more force than is necessary to arrest him."). While Plaintiff does not identify any factually identical case involving the deployment of a police dog to apprehend an individual under the circumstances presented in this case, it was clearly established, as of July 2015, that where the *Graham* and *Sharrar* factors do not suggest the need for extraordinary force, and where an arrestee is immobilized and neither resisting nor attempting to flee, the degree of force that an officer can use is reduced. *See Gulley v. Elizabeth City Police Dep't*, 340 F. App'x 108, 110 (3d Cir. 2009) (finding that it was clearly established that "beating a suspect on the face and head, who is lying down and not resisting arrest, would constitute excessive force in violation of the Fourth Amendment."); *Green v. New Jersey State Police*, 246 F. App'x 158, 163 (3d Cir. 2007) (holding it was clearly established that "a reasonable officer would know, based on the *Graham* and *Sharrar* factors, that it would be excessive to grab and choke an arrestee's throat, especially before using lesser force; to hit him on the head twice with a flashlight; and to kick him when he is already restrained and on the ground."); *Noble v. City of Camden*, 112 F. Supp. 3d 208, 228–29 (D.N.J. 2015) ("At the time Defendants acted, the law was clear that beating an unarmed suspect who was not resisting arrest violates the Fourth Amendment's prohibition against excessive force."); *see also Giles v. Kearney*, 571 F.3d 318,

326 (3d Cir. 2009) ("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); *Morrison v. Bd. Of Trustees Of Green Twp.*, 583 F.3d 394, 404 (6th Cir. 2009) ("This Court has consistently held in light of the reasonableness standard that 'use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'") (citation omitted).[8]

Here, as outlined in the first step of the Court's qualified immunity analysis, applying the *Graham* and *Sharrar* factors to the circumstances alleged by Plaintiff, and assuming Plaintiff did not reach for his waistband, no reasonable officer could believe that the deployment of a police dog to apprehend Plaintiff was reasonable. At the time that Trooper Robertson ordered Scales to apprehend Plaintiff, Plaintiff was not attempting to resist arrest, and was already restrained on the ground. Based on Plaintiff's version of the arrest, with regard to the location of his right hand, this is not a case falling on the "hazy border between excessive force and acceptable force." *Green,* 246 F. App'x at 162 (quoting *Saucier*, 533 U.S. at 206). Rather, Trooper Robertson's conduct in ordering Scales to apprehend Plaintiff, under the circumstances alleged

---

[8] Although several of the cases cited by the Court do not specifically involve police dog bites, they are nonetheless relevant to the Court's analysis. *See Cooper v. Brown*, 844 F.3d 517, 525 (5th Cir. 2016). In holding that it was clearly established that subjecting a compliant and non-threatening arrestee to a dog bite was objectively unreasonable, the *Cooper* court relied on non-dog-bite cases to find that it was clearly established, at the time of the officer's conduct, "that once an arrestee stops resisting, the degree of force an officer can apply is reduced." *Id.* at 524. The court explained that its reliance on non-dog-bite cases did not shield the officer, because "'[l]awfulness of force . . . does not depend on the precise instrument used to apply it. Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel.'" *Id.* at 525 (quoting *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012)). Similarly, here, the Court finds that it was clearly established, at the time of Trooper Robertson's conduct, that using a high degree of force, such as a dog, on a non-resisting, outnumbered, and immobilized suspect would violate an individual's Fourth Amendment rights.

by Plaintiff, would have been understood by a reasonable officer at the time to constitute an excessive use of force.[9]

The Court's analysis is unaltered by Trooper Robertson's testimony that, based on his experience, he believed Plaintiff posed a "high risk." In that regard, it was clearly established, at the time of Trooper Robertson's use of force, that even if an individual posed a threat at the time force was initiated, the officer "may not continue to use such force after it has become evident that the threat justifying the force has vanished." *Lamont*, 637 F.3d at 184 ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."); *see Cooper*, 844 F.3d at 524 ("Our caselaw makes certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced."); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 413 (5th Cir. 2009) (observing that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."); *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2004) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.").

Indeed, within the context of police dog bite cases, several courts have recognized that, once an arrestee stops resisting or attempting to flee, and ceases to pose a safety threat, using a police dog to apprehend the arrestee constitutes excessive force. *See, e.g.*, *Castellani*, 2017 WL

---

[9] While not binding on this Court, several district courts addressing similar factual circumstances have held that it is clearly established that using a police dog to apprehend a suspect who is not resisting arrest violates the Fourth Amendment right to be free from excessive force. *See Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 865 (S.D. Ind. 2006) (holding that it was clearly established that it would violate Fourth Amendment to order a police dog to "attack [the plaintiff] after he ceased fleeing and lay on the ground . . . ."); *Williams v. Hainje*, 583 F. Supp. 2d 967, 970 (N.D. Ind. 2008) ("[U]sing the force of a police dog on a person offering little or no resistance would clearly violate the Fourth Amendment such that a 'clearly established right' has been violated.").

3112820, at *15 ("While [the plaintiff] does not submit any factually-identical cases regarding the deployment of a police dog while five officers have already subdued a plaintiff, it was certainly clearly established in June 2013 that even if someone posed a threat at the time force was initiated on them, an officer cannot continue to apply serious force when the threat has subsided."); *Cooper*, 844 F.3d at 525 (finding that it was clearly established, at the time of the officer's conduct, that "subjecting a compliant and non-threatening arrestee to a lengthy dog attack was objectively unreasonable."); *Edwards v. Shanley*, 666 F.3d 1289, 1296 (11th Cir. 2012) ("[T]he *Graham* factors compel the conclusion that [the officer] used unreasonable force when he subjected [the plaintiff] to five to seven minutes of dog attack, while [the plaintiff] was pleading to surrender and [the officer] was in a position to immediately effect [the plaintiff's] arrest."); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (11th Cir. 2000) (holding that it was clearly established that ordering a police dog to apprehend, for a period of two minutes, a compliant, non-threatening, burglary suspect, who was on the ground and neither resisting arrest nor attempting to flee, was a Fourth Amendment excessive force violation).

Taken together, these cases stand for the proposition that once an arrestee stops resisting or attempting to flee, and ceases to constitute a safety threat, the level of force that a police officer may use is greatly reduced, such that reasonable force during the period of an arrestee's non-compliance becomes excessive once the arrestee is compliant. Here, Trooper Robertson's command to Scales occurred when Plaintiff was neither attempting to resist or flee, but rather, had voluntarily proceeded to the ground, and was lying face down, with two officers kneeling on his back. Additionally, according to Plaintiff, any safety risk that Trooper Robertson initially perceived had diminished: Plaintiff was complying with his arrest, and did not resist, lash out, or in any other way demonstrate a potential for violence. Thus, regardless of Trooper Robertson's

initial perceptions upon arriving in the parking lot, once it became apparent that Plaintiff did not pose an imminent safety threat[10] and was not resisting arrest, it was clearly established that ordering Scales to apprehend Plaintiff would constitute excessive force.

The Court recognizes that the instant case differs from several of the dog bite cases cited above, which focus on the duration of a police dog apprehension, rather than the initiation of a police dog apprehension. Nonetheless, regardless of whether the apprehension was already ongoing, or had just been ordered, the underlying premise is the same: a police dog apprehension that was initially justified becomes excessive once an arrestee stops resisting or attempting to flee, and ceases to constitute a safety threat. Thus, while the present case concerns the initiation of a police dog apprehension, rather than the continuation of a dog bite, the Court finds that a reasonable officer would be on notice that ordering a police dog to apprehend an arrestee, after the arrestee has stopped resisting, is demonstrably compliant with his arrest, and ceases to pose a safety threat, constitutes excessive force.

The Court finds persuasive *Castellani*, a recent decision within this District analyzing the applicability of qualified immunity on facts similar to those presented here.[11] In *Castellani*, the

---

[10] The Court notes that its analysis might have been different if, for example, Trooper Robertson had ordered Scales to apprehend Plaintiff when Plaintiff initially refused to obey the officers' demands to get down on the ground. Nonetheless, here, because Trooper Robertson's command to Scales came after Plaintiff was already demonstrably compliant, the Court finds that a reasonable officer would have been on fair notice that ordering a police dog apprehension under those circumstances constituted excessive force, assuming of course, Plaintiff's testimony that he did not move his hand to his waistband and posed no safety threat.

[11] While *Castellani*, a district court decision, was issued on July 21, 2017, after the conduct at issue in the present case, the Court does not cite to *Castellani* as a precedential opinion that Trooper Robertson should have been aware of at the time he directed Scales to apprehend Plaintiff. Rather, I only refer to *Castellani* insofar as I find the reasoning in that case persuasive. To that end, in *Castellani*, the court analyzed clearly established law pertaining to the use of police dogs to apprehend a suspect as of June 2013; law which also predated the alleged instance of excessive force in the instant case, which occurred on July 11, 2015. Accordingly, the

plaintiff filed an excessive force claim against several police officers, following an alleged assault after the plaintiff was ejected from a casino and arrested for disorderly conduct and public intoxication. 2017 WL 3112820 at *1. Relevant to this case, the plaintiff alleged that after he had been subdued, one of the officers "placed a police dog on his prone body, which inflicted severe bites to his chest and neck requiring hospitalization and several hundred stitches." *Id.* The officer moved for summary judgment on his entitlement to qualified immunity, arguing that "he was faced with a 'split-second decision' when he arrived and deployed his K9 partner for the safety of the other officers; thus, his use of force was entirely objectively reasonable, given the facts and circumstances known to [the officer] when he arrived at the scene of the struggle by which the officers were attempting to arrest [the plaintiff]." *Id.* at *12. The officer also argued that, at the time of his conduct, it was not clearly established that "releasing a vicious police dog to bite an un-armed, non-threatening individual who was immobilized by five other police officers violated the Fourth Amendment." *Id.* at *14.

The *Castellani* court rejected both of the officer's arguments, holding that "a reasonable jury could conclude that [the officer] used excessive force when he deployed his dog for over two minutes to continuously bite [the plaintiff] in the chest and in the back of the neck." *Id.* at *15. First, applying the *Graham* factors, the court found that the officer's conduct in deploying the canine was not "objectively reasonable." *See id.* at *13. The court explained that, as in the present case, the severity of the crime was low, and that, because the plaintiff was outnumbered five to one by police officers, and was on the ground with one arm handcuffed at the time the officer released the dog, no reasonable officer could believe that the plaintiff posed an immediate

_____

*Castellani* court's analysis of whether the officer in that case violated a clearly established right is germane, albeit not precedential, to the present matter.

threat or was armed and dangerous. *See id.* Additionally, the court found that, in light of the restraints imposed on the plaintiff, "it would have been impossible for [the plaintiff] to flee the scene or resist arrest after he was already subdued." *Id.* Under those circumstances, the court found that the officer's conduct was not "was not 'objectively reasonable,'" and thus, that the plaintiff "satisfied the first prong of the qualified immunity analysis." *Id.* at *14.

The *Castellani* court also held that the second prong of the qualified immunity analysis was satisfied, finding that it was clearly established, at the time of the officer's conduct, that releasing a police dog to bite an unarmed, non-threatening individual who was immobilized and outnumbered by police officers violated the Fourth Amendment. *Id.* at *14 ("[A] reasonable officer, even arriving late to the scene and assuming the other officers followed proper procedures, could not have believed that immediately unleashing his K9, without warning or without assessing the situation, to attack a person who . . . was not resisting arrest and restrained by five officers, was lawful."). The court explained that even though the plaintiff failed to submit any factually-identical cases regarding the deployment of a police dog while officers outnumbered and had already immobilized the suspect, it was clearly established, at the time of the officer's conduct, "that even if someone posed a threat at the time force was initiated on them, an officer cannot continue to apply serious force when the threat has subsided" – a principle which was "also clearly established in dog bite cases." *Id.* at *15. Accordingly, because the officer's use of force was not "objectively reasonable," and because it was clearly established, at the time of the officer's conduct, that releasing a police dog to bite a non-threatening, non-resisting individual, who was immobilized by several police officers, would

violate the Fourth Amendment, the court found that the officer was not entitled to qualified immunity.[12] *See id.*

Similar to *Castellani*, here, based upon the MVR and the deposition testimony, and assuming as true Plaintiff's averment of the one disputed fact, the location of Plaintiff's right hand, Trooper Robertson ordered Scales to apprehend Plaintiff while Plaintiff was not resisting arrest or attempting to flee, was outnumbered by police officers, and was immobilized in the prone position, with his left arm in handcuffs. Under those circumstances, Trooper Robertson's use of force violated a clearly established right. While Plaintiff fails to identify a factually identical case, the Supreme Court has stated that "a case directly on point" is not required. *al-Kidd*, 563 U.S. at 741; *see Davenport v. Borough of Homestead*, No. 16-3892, 2017 WL 3710763, at *5 (3d Cir. Aug. 29, 2017). Rather, conduct violates clearly established law where existing precedent places the constitutional question "beyond debate," such that a reasonable

---

[12] In fact, the *Castellani* court found that the constitutional violation in that case "was so 'obvious' that the *Graham* standard itself gives fair warning that a violation was clearly established." 2017 WL 3112820 at *15. To that end, as referenced in footnote six, *supra*, the Supreme Court has held that "in an obvious case, [the *Graham* and *Garner* standards] can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *see Pauly*, 137 S. Ct. at 552 ("[W]e have held that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'"). In that connection, the Court has observed that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (quoting *Anderson*, 483 U.S. at 640). Thus, "'[t]he easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.'" *Lanier*, 520 U.S. at 271 (citation omitted). Here, accepting Plaintiff's allegations as true, the force employed by Trooper Robertson does not straddle the line between excessive and acceptable force, and therefore, the Court finds that application of existing precedent regarding excessive force, coupled with the general test of reasonableness set forth in *Graham*, would lead any reasonable officer, confronted with the circumstances present in this case, to conclude that using a canine to apprehend Plaintiff would violate clearly established rights.

officer would be on fair notice that the alleged conduct is unlawful. *al-Kidd*, 563 U.S. at 741. Based on relevant precedent at the time of Trooper Robertson's conduct, and assuming as true Plaintiff's testimony regarding his right hand, the Court finds that the clearly established threshold has been satisfied here, because, at the time of Trooper Robertson's conduct, a reasonable officer would not have believed that deploying a police dog to bite Plaintiff was legal under the circumstances.

In sum, viewing the facts in the light most favorable to Plaintiff, the Court holds that Trooper Robertson has not satisfied his burden of proving the defense of qualified immunity, because a critical dispute of fact remains over whether Plaintiff moved his right hand to his waistband, and thus, Trooper Robertson's Motion for Summary Judgment is denied.[13] Because there is a dispute of fact as to whether Plaintiff, during the course of the arrest, attempted to reach into his waistband, and thus, posed a safety risk, the Court cannot conclude at this stage of the proceedings that Trooper Robertson would not be able to claim immunity once the factfinder resolves the disputed facts. Therefore, Trooper Robertson may, at trial, renew his request for qualified immunity, if and when appropriate.

## II.    FAILURE TO INTERVENE

In Count Two of the Complaint, Plaintiff asserts a § 1983 claim against the East Brunswick Defendants, alleging that the East Brunswick Defendants failed to intervene against the excessive force used by Trooper Robertson, when they had both a duty and a reasonable

---

[13] Trooper Robertson's Motion on Plaintiff's claim of excessive force is likewise denied, because a dispute of fact exists over whether Plaintiff's right hand moved towards his waistband, a fact that may be material to the determination of whether Trooper Robertson used excessive force. Since a reasonable jury could conclude that, under the facts alleged by Plaintiff, Trooper Robertson's conduct violated the Fourth Amendment's prohibition against excessive force, Plaintiff's excessive force claim must proceed, and determinations over these disputes of fact will be left to the collective wisdom of the jury.

opportunity to do so. The East Brunswick Defendants move for summary judgment on Plaintiff's failure to intervene claim, arguing that they did not have a reasonable opportunity to intervene to prevent Trooper Robertson from ordering Scales to apprehend Plaintiff. Specifically, the East Brunswick Defendants maintain that they were in the process of restraining Plaintiff when Trooper Robertson deployed Scales, and were unaware that Trooper Robertson would order Scales to apprehend Plaintiff prior to the bite. The East Brunswick Defendants also maintain that, even if the Court finds that Plaintiff has sufficiently alleged a claim for failure to intervene, they are nonetheless entitled to qualified immunity.

A police officer can be held liable under § 1983 for failing to intervene to prevent a constitutional violation that occurs in his presence. *See Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) ("'If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.'") (quoting *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986)). However, liability for failure to intervene only attaches where the officer had "a realistic and reasonable opportunity to intervene." *Mensinger*, 293 F.3d at 651. Thus, to establish a Fourth Amendment violation for failure to intervene, Plaintiff must demonstrate that the East Brunswick Defendants: (1) observed or had knowledge that a constitutional violation was taking place, yet failed to intervene; and (2) had a reasonable and realistic opportunity to intervene. *See Williams v. Guard Bryant Fields*, 535 F. App'x 205, 210 (3d Cir. 2013); *see Fears v. Beard*, 532 F. App'x 78, 82 (3d Cir. 2013) ("An officer's failure to intervene can be the basis of an [constitutional] violation under § 1983 if the officer, upon witnessing another's use of excessive force . . . , 'had a reasonable opportunity to intervene and simply refused to do so.'")

(quoting *Mensinger*, 293 F.3d at 651). "It is plaintiff's burden to adduce evidence of both requirements." *Lora-Pena v. Denney*, 760 F. Supp. 2d 458, 468 (D. Del. 2011).[14]

In the instant matter, the Court finds that Plaintiff has failed to establish that the East Brunswick Defendants had prior knowledge that Trooper Robertson was going to direct Scales to apprehend Plaintiff, or that the East Brunswick Defendants had a reasonable and realistic opportunity to intervene. In that regard, it is undisputed that Trooper Robertson did not warn Plaintiff or any of the other officers that he planned to order Scales to apprehend Plaintiff prior to the time that the bite occurred. Robertson Dep. 86:12-19; Plaintiff's Supplemental Statement of Material Facts ("PSSMF") ¶ 10; East Brunswick Defendants' Response to PSSMF ("EBDRPSS") ¶ 10. Nor does Plaintiff dispute the East Brunswick Defendants' testimony that they were not aware that Scales had bitten Plaintiff until after the bite occurred and had ended. Danese Dep. 69:16-25; Jun Dep. 31:12- 32:1; Plaskon Dep. 30:22-31:11; PRSMF ¶¶ 25-26. Indeed, Officers Danese and Jun were actively engaged in restraining Plaintiff at the time the dog bite occurred. Additionally, as the parties agree, and the MVR confirms, the dog bite in this case lasted for a period of three seconds. MVR at 23:12:22-25. Because none of the officers actually observed the excessive force in this case, and because the force used was significantly limited in duration, the Court cannot conclude that the East Brunswick Defendants had a reasonable opportunity to intervene to prevent the dog bite. *See Ensley v. Soper*, 142 F.3d 1402, 1408 (11th

---

[14] The Court notes that because Plaintiff's failure to intervene claim is premised on his claim for excessive force, if there were no excessive force, Plaintiff's failure to intervene claim would necessarily fail. *See Abdullahi v. City of Madison*, 423 F.3d 763, 767–68 (7th Cir. 2005) ("Though legally distinct, the fate of plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene."). Nonetheless, having found that a reasonable jury could conclude that Trooper Robertson used excessive force, the Court will proceed with its analysis of Plaintiff's failure to intervene claim.

Cir. 1998) (dismissing the plaintiff's claim for failure to intervene, where the officer was actively involved in arresting another individual, and thus, was not "in a position to intervene.").

Indeed, Plaintiff has not presented any evidence to rebut the East Brunswick Defendants' testimony that they were not aware of the dog bite until after it occurred. Importantly, Plaintiff does not dispute that the dog bite occurred contemporaneously with the arrest. The MVR corroborates this fact; it demonstrates that the dog bite lasted for a period of three seconds, and that the entirety of the arrest – from the time Plaintiff got down on one knee through the dog bite, lasted less than ten seconds. MVR at 23:12:17-25. Unlike in cases where courts have found that an officer could be liable for failure to intervene, the alleged incident of excessive force in this case did not occur over a protracted period of time. *See Mensinger*, 293 F.3d at 648 (finding a material dispute of fact existed regarding whether the officer had a reasonable opportunity to intervene, where the plaintiff alleged that he was subjected to a "vicious, *prolonged* attack . . . .") (emphasis added); *Kopec v. Tate*, 361 F.3d at 777 ("Kopec alleges that Officer Tate placed handcuffs on him that were excessively tight and failed to respond to Kopec's repeated requests for them to be loosened. He estimates that it took Officer Tate ten minutes to loosen the handcuffs despite the severe pain they were causing and his efforts to secure their release."); *see Priester*, 208 F.3d at 925 (finding that a reasonable jury could conclude that the officer had an opportunity to intervene to prevent use of excessive force that occurred for two minutes).

In *Priester*, for example, the plaintiff asserted a claim for failure to intervene against the defendant-officer, who had witnessed another officer order a canine to bite and hold the plaintiff for two minutes. 208 F.3d at 925. The Court of Appeals reversed the district court's finding that the defendant was entitled to qualified immunity on the failure to intervene claim, holding that "[t]wo minutes was long enough for a reasonable jury to conclude that [the defendant] had time

to intervene and to order [the other officer] to restrain the dog." *Id.* Nonetheless, the court noted that "because [the defendant] stood on top of the canal with his flashlight on the scene and watched the entire event and was in voice contact with [the other officer], this case is distinguishable from those cases where an officer who failed to intervene was found not liable because he did not observe the violation or have the opportunity to intervene." *Id.*

Unlike the use of excessive force in *Priester*, however, the police dog bite in this case only lasted for a period of three seconds, and accordingly, the East Brunswick Defendants did not have sufficient opportunity to intervene against the use of excessive force. Moreover, while the defendant in *Priester* watched the dog bite, the East Brunswick Defendants were actively engaged in arresting Plaintiff, and did not observe Scales bite Plaintiff's leg. Rather, the East Brunswick Defendants only became aware of the dog bite after the fact. Because the East Brunswick Defendants did not observe Scales bite Plaintiff, and the duration of the dog bite lasted only three seconds, this case falls squarely within the type of case that the *Priester* court recognized as insufficient to state a claim for failure to intervene. *See id.* at 925.[15]

Nevertheless, in arguing that the East Brunswick Defendants had a reasonable opportunity to intervene, Plaintiff relies on the East Brunswick Defendants' testimony that they were aware that Scales was present at the scene of the arrest prior to the time that Plaintiff was apprehended. Danese Dep. 67:24-68:22; Jun Dep. 29:20-30:1; Plaskon Dep. 54:22-55:25. However, the Court cannot find that the officers had a duty to intervene prior to the time that

---

[15] The Court notes that at least one court has found that officers do not have a reasonable opportunity to intervene to prevent or stop a police dog bite, where the plaintiff failed to allege that the police dog took commands from anyone other than its handler. *See Ballard v. Hedwig Vill. Police Dep't*, 408 F. App'x 844, 845 (5th Cir. 2011). In any event, here, the Court does not reach the issue of whether Scales would have obeyed commands from the East Brunswick Defendants to stop attacking Plaintiff, in light of the undisputed evidence that the East Brunswick Defendants were not aware of the attack until after its occurrence.

Trooper Robertson ordered Scales to apprehend Plaintiff.  To that end, in excessive force cases, the duty to intervene does not arise until excessive force is used.  *See Mensinger*, 293 F.3d at 641.  In other words, officers only have a duty to prevent constitutional violations that occur in their presence.  Indeed, it would create an anomalous result to require officers to predict potential constitutional violations before they occurred.  Here, the relevant constitutional violation was the excessive force employed by Trooper Robertson in ordering Scales to apprehend Plaintiff.  Prior to the use of that force, the officers did not have a duty to intervene.  Moreover, contrary to Plaintiff's contention in his opposition brief, there is no basis to find that the East Brunswick Defendants were required to ask Trooper Robertson to remove Scales from the scene at the outset of the arrest, because, prior to the time Plaintiff got down on the ground, the East Brunswick Defendants were not yet able to determine whether Plaintiff would be compliant or posed a safety risk; to wit, they approached Plaintiff with their guns drawn.  And, as this Court has already found, once the constitutional violation took place, the East Brunswick Defendants did not have a reasonable opportunity to intervene.  To the contrary, the use of excessive force had ended by the time the East Brunswick Defendants were alerted that Scales had apprehended Plaintiff.  Accordingly, Plaintiff's failure to intervene claim fails as a matter of law, and the East Brunswick Defendants' Motion for Summary Judgment is granted.

## III.     NJCRA CLAIMS

In Count Three of the Complaint, Plaintiff asserts claims against Trooper Robertson and the East Brunswick Defendants under the New Jersey Civil Rights Act that mirror his constitutional claims; *i.e.*, that Trooper Robertson used excessive force by deploying Scales, and that the East Brunswick Defendants failed to intervene to prevent the use of excessive force.

The NJCRA[16] was modeled after § 1983, and thus, courts in New Jersey have consistently looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011); *Chapman v. New Jersey*, No. 08–4130, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart . . . ."); *Armstrong v. Sherman*, No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 . . . ."). Accordingly, Plaintiff's NJCRA claims will be interpreted analogously to his § 1983 claims. *Trafton*, 799 F. Supp. 2d at 443–44; *see Hedges v. Musco*, 204 F.3d 109, 121 n. 12 (3d Cir. 2000) (concluding New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment). Because the Court has found that a reasonable jury could conclude that Trooper Robertson's use of force was not "objectively reasonable," the Court will not enter summary judgment in favor of Trooper Robertson on Plaintiff's NJCRA claim. However, because I find that Plaintiff has not sufficiently alleged a failure to intervene claim against the East Brunswick Defendants under § 1983, Plaintiff's NJCRA claim for failure to intervene also fails, and summary judgment is granted in favor of the East Brunswick Defendants on Plaintiff's NJCRA claim.

---

[16] The NJCRA "creates a private cause of action for violations of civil rights secured under the New Jersey Constitutions." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). Specifically, it provides, in pertinent part, a private cause of action to:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law . . . .

N.J.S.A. 10:6-2(c).

## **CONCLUSION**

For the foregoing reasons, Trooper Robertson's Motion for Summary Judgment is

DENIED, and the East Brunswick Defendant's Motion for Summary Judgment is GRANTED.


Dated:  October 11, 2017                                  /s/ Freda L. Wolfson
                                                         Hon. Freda L. Wolfson
                                                         United States District Judge